[No. 20211. Department Two. April 19, 1927.]

PEOPLES STATE BANK OF WALLA WALLA, *Appellant,* v.
M. L. DRISCOLL, *as Administrator of the Estate
of W. D. Grandy, Deceased,
Respondent.*[1]

[1] CONTRACTS (36-1)—DURESS—CAPACITY TO CONTRACT. A finding by a jury that the signer of a note was not competent to execute the same at the time, is sustained where there was proof from the physicians and attendants that he was a very sick man under the influence of morphine and incompetent to transact business or form a judgment or resist the influences by which he was induced to make the note:

[2] TRIAL (64)—DIRECTION OF VERDICT—OPERATION AND EFFECT OF MOTION. Where the court overruled the plaintiff's motion for a directed verdict, and the defendant thereupon moved for a nonsuit, it is not error to allow the trial to proceed and both sides to submit their evidence to the jury, even if the motion for a nonsuit might have been considered as a motion to submit the matter to the court.

[3] JURY (2)—RIGHT TO JURY TRIAL—NATURE OF CAUSE. It is not error to allow a jury trial where all the substantial issues were properly triable to a jury and the few issues of equitable

[1]Reported in 255 Pac. 134.

cognizance were directly disposed of by the court out of the hearing of the jury and there was no attempt to present them to the jury.

Appeal from a judgment of the superior court for Franklin county, Truax, J., entered February 23, 1926, upon the verdict of a jury in favor of the defendant, in an action on contract. Affirmed.

*Rader & Bean* and *Edward A. Davis,* for appellant.

*Driscoll & Horrigan* and *Green & Hess,* for respondent.

PARKER, J.—The plaintiff bank seeks recovery upon a promissory note executed and delivered to it by W. D. Grandy prior to his death. The defendant, administrator of the estate of Grandy, resists recovery upon the ground of failure of consideration, undue influence on the part of the president of the plaintiff and those acting with him inducing Grandy to execute the note, and want of mental capacity on the part of Grandy to resist such undue influence or to understandingly execute the note. A trial in the superior court for Franklin county, sitting with a jury, resulted in verdict and judgment denying to plaintiff any recovery, from which it has appealed to this court.

The note sued upon was executed on September 28, 1922, is for the principal sum of four thousand dollars, and made payable one year after date at appellant's bank in Walla Walla. At the time of the execution of the note, one Dorner was, and for some time had been, indebted to appellant in the sum of seven thousand dollars, evidenced by a promissory note for that principal sum which was then past due and wholly unpaid. That note was partially secured by a chattel mortgage held by appellant upon the whole of the farming outfit owned by Dorner, consisting of teams and farm machinery, of the value of approximately three thousand dollars only,

and not otherwise secured.  Dorner was then a tenant of Grandy, farming approximately one thousand acres of wheat land owned by him, situated in Franklin county, under a contract by which Grandy was to receive a share of the crops as rent.  Dorner was then insolvent, aside from his prospect of raising another crop of wheat, which was then about to be sown by him upon Grandy's land which was then partially prepared for crop, in that it had been summer-fallowed.  Thus, appellant became interested in obtaining additional security for the seven thousand dollars indebtedness owing to it from Dorner.  Appellant was then legally entitled to foreclose its mortgage upon Dorner's farming outfit; realizing, however, that to then do so would almost certainly result in its 'receiving practically nothing more upon that indebtedness than the amount for which the farming outfit would sell at a foreclosure sale, and that a foreclosure sale taking from Dorner his farming outfit would prevent him from proceeding to produce the prospective crop then about to be sown by him.

These conditions confronting appellant and Dorner were apparently the moving cause of appellant's president and Dorner going together to see Grandy at La Grande, Oregon, where he then lived, with a view of inducing him to finance Dorner in some manner that would secure to appellant Dorner's seven thousand dollar indebtedness, in addition to the security of the chattel mortgage upon his farming outfit.  They arrived at Grandy's home at La Grande about 10:30 o'clock, a. m. on September 28, 1922, finding him, as the jury were warranted in believing and as the jury manifestly did believe, to be a very sick man.  Grandy's then physical and mental condition we shall presently further notice. They there laid before him the situation substantially as above noticed, the president of appellant participat-

ing therein even more than did Dorner. They informed Grandy, in substance, that appellant would immediately foreclose its chattel mortgage upon Dorner's farming outfit and thus prevent him from proceeding with the raising of the prospective crop, unless Dorner should be immediately aided in the furnishing to appellant of additional security; suggesting to Grandy that he should become surety for Dorner for the whole of the seven thousand dollars indebtedness owing to appellant, and pointing out to Grandy that he would lose the opportunity of having Dorner raise the prospective crop of wheat on his land if Dorner's outfit should be sold by foreclosure sale.

Finally, at the conclusion of a period of such persuasion, lasting from one to two hours, when Grandy had become mentally and physically exhausted, being even at the beginning of the conference very much weakened in those respects, he signed the four thousand dollar note sued upon in this action. Recovery upon the note is not sought upon the theory that it in the beginning evidenced an absolute indebtedness from Grandy to the bank, but upon the theory that it was given as collateral to the seven thousand dollars indebtedness evidenced by the note held by appellant against Dorner; appellant agreeing that it would not ask payment from Dorner or foreclose the chattel mortgage upon his farming outfit until after the production of the crop, for which reason the four thousand dollar collateral note was made payable one year after date.

In September, 1923, at the expiration of the year of extension of the time for the payment of Dorner's indebtedness and the maturity of the four thousand dollar collateral note, according to its written terms, appellant received surrender from Dorner of the whole of his farming outfit, which, by consent of him and appel-

lant, was sold by appellant for the sum of three thousand dollars, in lieu of foreclosure, which sum was credited upon the seven thousand dollar note held by appellant against Dorner, leaving a balance due upon that note of something more than five thousand dollars including interest. It is conceded by all parties that the three thousand dollars received by appellant in the disposition of Dorner's farming outfit was the fair value thereof. Thereafter this action was commenced, seeking recovery upon the note, resulting in verdict and judgment in favor of the administrator as we have already noticed.

We now turn to the physical and mental condition of Grandy at and near the time of his execution of the note here sued upon. Prior to the physical and mental affliction of Grandy, existing at the time of the execution of the note, which affliction had its inception many months prior thereto and continued with increasing seriousness until the time of his death, which occurred November 18, 1922, within two months after he executed the note sued upon, he was strong and vigorous, both physically and mentally. He was naturally a shrewd business man. His afflictions during this long period of his last sickness are best shown by quotations which we here make from certain of the witnesses testifying in this case. Dr. Kirby, one of Grandy's doctors who attended him, commencing some time prior to the execution of the note until the time of his death, testified in part as follows:

"I was acquainted with W. D. Grandy for four or five years. . . . Dr. Biggers was the attending physician. . . . I was in consultation with Dr. Biggers. Dr. Biggers would come along every once in awhile in the two or three months before Grandy died and take me down to see him. Sometimes I went down once a week and some times every two or three days. From

about the first of September I saw him about once a week to November 18th when he died. . . . His physical condition from the first of September, 1922, was bad. Mr. Grandy primarily was suffering from a condition commonly known as Bright's disease with its accompanying sequela. This is a heart complication. The heart labors and the left side of the heart dilates. The arteries harden with increased blood pressure. The blood pressure in Mr. Grandy, I believe, went to about 240 to 280 which normally is about 140. He became pale. He didn't lose much flesh. If he did lose flesh he didn't show it because with Bright's disease people bloat. He also complained very much of dizzyness and heart lesion gave him a great deal of pain. He had an oppression always and couldn't breathe right. He was a very sick man. I could not say as to his condition on the date the note was signed. I can only say that I was there some time during the week of October 5th and the week previous to that, but whether I was there on the 28th I don't know. I was there two or three days one way or the other before or after September 28th. His condition then was about as I have outlined. He was getting progressively worse. . . . Just prior to the 28th of September his mental condition was slow. He was very much worried. I thought he was going to die. We had to give him quite a little morphine. His mind wasn't bright and clear at any time during the two months and one-half that I saw him, and from the beginning of the two months and a half until the date I ceased to take care of him it was gradually worse. About September 28th he was very much worried and concerned about things. I know from my experience as a physician as to whether or not Grandy was taking morphine, from September first on. I could tell that from the contracted pupil of his eye. Morphine given to a patient stupefies. A patient having taken morphine within one or two hours from any given point mentioned would be sleepy and stupid and not able to comprehend. . . . Mr. Grandy was gone. He wasn't capable when he didn't have the morphine and he wasn't capable when he did have the morphine, to exercise a very

good, straight judgment.  Mr. Grandy was very, very sick and morphine didn't help him any. . . ."

Dr. Biggers, Grandy's regular attending doctor mentioned by Dr. Kirby, testified by deposition in part as follows:

"I reside right here.  (LaGrande, Oregon.)  I have practiced medicine since 1903.  Acquainted with W. D. Grandy all of his life.  I was chief physician during his last illness.  I doctored Grandy the last seven years. He was down more or less all summer during 1922. Every time I left to go anywhere I had to turn him over to another physician.  He was up and down.  The last part of September, 1922, he was sick and pretty near the end of his row.  He was pretty near gone.  We expected him to die at one time in July.  I don't know why he didn't.  He started with high blood pressure and developed neuphritis and Bright's disease.  Mentally the man was fairly good at times, and part of the time he was no good at all mentally.  I was there on September 28.  He was full of morphine, on that morning when I saw him.  It made him sleepy and dull.  He should not have been allowed to transact any business.  I could not swear as to the date. . . .  I went there so often I could not say, but I think it was before noon, around ten or eleven o'clock.  It might have been in the afternoon, but I don't think so.  He was asleep and snoring. He could not sleep without morphine.  He was asleep when I saw him that day.  He would go to sleep in ten or fifteen minutes after being given a dose of morphine. The morphine would hold him for four or five hours. . . .  I don't think he was capable of doing business. The last six months he was very sick.  Would have head aches and hold his head with both hands and cry.  After taking morphine he would seem to be quieted and when so quieted he would some times converse in a fairly normal way and sometimes not.  After a long rest his mind was fairly good.  At times he would carry on his business and at other times he could not. . . ."

Mrs. Grandy testified in part as follows:

"I am the widow of W. D. Grandy, deceased. Mr. Grandy had a very bad spell the later part of July, and got clear down. He got so bad that his kidneys absolutely refused to function and doctors said he couldn't live. I gave him a sweat and that seemed to help him and he got up and around and he failed from that time. He was always worse after that, but lived until the 18th of November. . . . He had Bright's disease. I am a graduate nurse of the Deaconess Hospital of Spokane. I had five months as office nurse at Hot Lake and a year of private practice. As to his general physical condition from July, 1922, up to the 28th of September he failed very perceptible. His face was haggard and drawn and he had great difficulty in breathing at times. Some times he wouldn't have as much trouble as others. Walked with a cane all the time. In health had a ringing stride. Got so he shuffled in his walk. His whole appearance changed. Had the appearance of a very sick man. . . . After he became so ill his mind wasn't bright and clear. I recall very well the occasion on the 28th of September when Mr. Marshall [appellant's president] and Mr. Dorner came to the house. He had a very poor night. I kept him propped up with pillows most of the night and with the windows open, and fanned him occasionally, and he spent the night that way. He dozed at intervals. He seemed to breathe easier in the night than he did in the day time. In the morning he felt very bad, and I gave him a hypodermic injection of morphine and put his bath robe on over his night shirt and put his slippers on and let him out into the living room and sat him down in a big over stuffed chair by the stove. Mr. Dorner came to see him. He was in a very short time. I don't know what the text of the conversation was. I gave him morphine that morning. He was exhausted, felt so miserable that I gave him the morphine. It was within an hour before these men came. It was before I sat him up in the chair. It was while he was sitting in the chair these men came. I can't remember how near the time was. He was much easier after I gave the morphine, physically so. He

wasn't so bright. Morphine excites the imagination ordinarily and dulls the judgment. That has been my observation. When these men came in he had his morphine and his mind was not normal, of course. I was there just at the time the men came. I don't know personally anything about the matter during the time they were there. I know what his condition was when I came back, it was not normal because he had morphine before they came. The external manifestation was that he was easier and resting comfortably. His mind was not bright and clear. He was absolutely in no condition to do business even without morphine. He had a stroke of apoplexy about the 7th of October. He didn't do any business after the 28th of September. I don't recall any piece of business that he transacted after that date. When people came down he talked about business all the time and worried. His affairs were in a muddled shape and he worried constantly to the end. . . . When these men came in I left, because Mr. Phy had come in and I considered Mr. Phy one of Mr. Grandy's best friends, and he had consulted with him on matters of business. I felt he would look after things. He didn't like to have me around when he was talking over business. Ordinarily any way I most always went out. A woman stopped me down town and I was gone longer than I intended. I don't recall how long I was gone, but it was about an hour. When I returned he was just signing this paper and they left immediately after I returned. By these men I mean Mr. Marshall and Mr. Dorner and I believe Judge Phy was there, but I wouldn't swear to it. He immediately fell into a deep sleep. He was just thoroughly exhausted and slept for some time, and when he awakened he called me in and cried and said he had just done the worst piece of business that he had ever done in his life and that he surely wasn't competent to attend to his business affairs after doing a thing like that."

There was other testimony tending to show that Grandy was, on September 28, 1922, mentally normal, and that he understandingly executed the note without

being unduly influenced to do so, and thus there was conflict in the evidence touching his condition.

[1] The principal and most strenuously pressed contention here made in behalf of appellant is that the evidence does not sustain either the affirmative defense of failure of consideration or undue influence and want of mental capacity to resist such undue influence, and that, since the execution of the note by Grandy, that is, its signing by him, is conclusively shown, the trial court should, as a matter of law, have decided the case in favor of appellant and rendered final judgment accordingly, awarding to it recovery upon the note, appropriate motions having been made in that behalf. We cannot agree with this contention. Our summary of the facts and quotation of the evidence above made, which we think the jury were well warranted in believing, to our minds sustain the verdict and judgment, to the extent that the merits of the case could not be otherwise decided as a matter of law. We feel that no argument is here necessary to be made in support of this conclusion further than the recitals above made by us.

[2] At the close of the evidence introduced in behalf of appellant, consisting of the introduction of the note and oral proof of its being unpaid, including proof of the exhausting of the chattel mortgage security for the seven thousand dollar note, leaving some five thousand dollars due thereon, as to which the note here sued upon was only claimed to be collateral, counsel for respondent administrator moved the court

"   .   .   .   for a directed verdict in favor of the defendant, and that the plaintiff be non-suited, for the reason that it has failed to establish a cause of action against the defendant."

This was followed by a ruling of the court denying the motion, and thereafter counsel for appellant stated:

"We take the position that is a motion for a directed verdict . . . ; that under that motion it is the duty of this court to take the case away from the jury and decide it upon the evidence introduced."

Thereupon counsel for the administrator stated:

"We ask for a non-suit. We will change that. The defendant moves that the plaintiff be non-suited in that it has failed to prove a case against the defendant."

Thereupon the court again denied the motion made in behalf of the administrator, making no response to the above quoted statement made by counsel for the plaintiff. This is the whole of the incident upon which counsel for appellant now rest their contention that the trial court should at that time have taken the case from the jury and finally decided it upon the merits; seemingly upon the theory that counsel for the administrator, by his motion, waived further right to trial by the jury, citing *Knox v. Fuller*, 23 Wash. 34, 62 Pac. 131, *Easterly v. Mills*, 54 Wash. 356, 103 Pac. 475, 28 L. R. A. (N. S.) 952 and *Sevier v. Hopkins*, 101 Wash. 404, 172 Pac. 550, which decisions, however, all have to do with motions in a jury trial, evidencing waiving of jury trial, by counsel upon both sides, made at the conclusion of all evidence introduced upon both sides. Those were also cases wherein the courts, in response to such motions, took the cases from the juries upon the theory of both sides waiving jury trial. That is not this case. We do not here have the question whether or not the trial court would have been in error to the prejudice of either of these parties had the court taken the case from the jury and decided it as if there had been a waiver of jury trial. The fact remains that the court did not do so, but allowed counsel for the administrator to proceed to introduce evidence in support of the affirmative defenses and ultimately submitted the case to the jury upon all of the evidence introduced upon both sides. It

would not have been erroneous to the legal prejudice
of appellant, even had there been, by motion upon both
sides at the close of all the evidence, a waiving of jury
trial. In *McClure v. Wilson,* 109 Wash. 166, 186 Pac.
302, 18 A. L. R. 1421, this view of the law was announced
even as applicable to motions made upon both sides for
directed verdicts at the close of all of the evidence. In
so deciding, we said:

"Had the trial judge taken the case from the jury and
decided it upon the merits as to questions of both law
and fact at the time of disposing of the motions for
instructed verdict, before the submission of the case to
the jury, we may concede, for present purposes, that
he would have been warranted in so disposing of the
case; but we are of the opinion that, since these mo-
tions were denied and the judge did, as a matter of
fact, submit the case to the jury, fully and fairly sub-
mitting to it the questions of respondents' negligence
and appellant's contributory negligence, that the dispo-
sition of the motions for directed verdict, made before
such submission of the case to the jury, is a closed
incident in the trial which can have no effect upon the
subsequent proceedings therein. This is a law case of
the purest kind, no relief being sought other than a
money judgment for damages. It is not a question,
therefore, of the verdict of the jury being merely ad-
visory, as may occur in an equity case. After the dis-
position of the motions for directed verdict, the trial
judge proceeded in the usual course of the trial of a
law action, fully and fairly submitting all the issues in
the case to the jury which were proper to be submitted
to the jury in such a case. It seems quite clear to us
that the jury's verdict was as binding upon the judge in
this case as in any other law case, and that we must
now test the correctness of his disposition of the motion
for judgment notwithstanding the verdict in the same
manner as if the prior motions for directed verdict had
not been made."

In *Browder v. Phinney,* 30 Wash. 74, 70 Pac. 264,
holding that the overruling of defendant's challenge to

the sufficiency of the plaintiff's evidence, made at the close of the plaintiff's evidence, does not entitle the plaintiff to judgment or prevent the defendant from proceeding with his proof, Judge Dunbar, speaking for the court, said:

"We do not agree with the contention of the appellants [plaintiffs] that they are entitled to judgment because the sufficiency of the evidence was challenged by the respondent [defendant]. Nor do we think this court has ever held such a doctrine. It has been the universal practice, which, so far as we know, has gone unchallenged, that, where a motion of this kind has been overruled, the defendant either stood upon the motion or proceeded with the introduction of his testimony."

We conclude that the court did not err to the prejudice of appellant in letting the trial proceed before the jury after denying the non-suit motion of counsel for the administrator, even though the remarks of counsel for appellant might be considered as a motion that the court then decide the case as a matter of law in favor of appellant.

[3] Contention is made in behalf of appellant that, as the issues were made by the pleadings, the case became one of equitable cognizance, and therefore it should have been tried by the court without a jury, as requested by its counsel at the beginning of the trial. There may be some ground for contending that one or two of the issues were of equitable cognizance. In any event, there was no attempt to present these to the jury, and we think they were correctly disposed of by the court upon evidence heard by the court out of the hearing of the jury. Being so disposed of, we see no prejudicial error in submitting the other branch of the case as an ordinary law jury case. We are unable to see that the above mentioned defenses, which were submitted to the jury, were not properly set up and triable as jury issues. We conclude that the trial court prop-

erly allowed the trial to proceed, as to what we conceive to be all of the substantial issues therein, as a jury case.

Some contentions are made touching the rulings of the trial court upon the introduction of evidence, and also touching rulings of the trial court in the giving and refusing of certain instructions. What we have already said in a considerable measure disposes of these contentions, otherwise we do not deem them of sufficient merit to warrant serious consideration here. The big question in this case is whether or not the evidence sustains the verdict and judgment.

We conclude that the judgment must be affirmed. It is so ordered.

MACKINTOSH, C. J., TOLMAN, and ASKREN, JJ., concur.